UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHAO-HUI T. KAO,<br><br>          Plaintiff,<br><br>     v.<br><br>AETNA LIFE INSURANCE COMPANY<br>and TOWERS PERRIN FORSTER &<br>CROSBY, INC.,<br><br>          Defendants. | HONORABLE JOSEPH E. IRENAS<br><br>CIVIL ACTION NO. 08-2824<br>(JEI/AMD)<br><br>**OPINION** |

**APPEARANCES:**

BROSS & GROUP, PA
By:  Richard Lowell Frankel, Esq.
102 Browning Lane, Building C-1
Cherry Hill, NJ 08003
     Counsel for Plaintiff

GENOVA, BURNS & VERNOIA
By:  Dena B. Calo, Esq.
     James Bucci, Esq.
One Port Center
2 Riverside Drive, Suite 502
Camden, NJ 08103
     Counsel for Defendants

**IRENAS**, Senior District Judge:

In this ERISA[1] action, Plaintiff Shao-Hui T. Kao ("Kao") seeks disability benefits to which she asserts entitlement under her Long-Term Disability ("LTD") benefits plan.  The LTD benefits plan in question is funded by Defendant Towers Perrin Forster & Crosby, Inc. ("Towers").  Defendant Aetna Life Insurance Company ("Aetna") is the LTD claims administrator.

---

[1] The Employee Retirement Income Security Act ("ERISA") is codified at 29 U.S.C. §§ 1001-1461.

Presently before the Court are the parties' Cross-Motions for Summary Judgment.  For the reasons that follow, Defendants' Motion for Summary Judgment will be granted, and Kao's Motion for Summary Judgment will be denied.[2]

**I.**

**A.**

Kao is a 59 year old woman who holds a bachelor's degree in botany, a master's degree in computer science, and a doctorate in bacteriology.  (AR[3] 520)  From 1986 to 1998, Kao worked as a computer programmer for several companies.  (See AR 547)  Beginning in 1998, she worked for Towers as a software developer/systems architect.  (AR 301, 548)  In that capacity, she was responsible for the "full life cycle development" of retirement valuation software.  (AR 301)  Her tasks included software design, coding, and testing, as well as providing user support.  (AR 301)  In November, 2004, while Kao was still employed with Towers, she was diagnosed with breast cancer.  (See AR 531)  She underwent chemotherapy and a lumpectomy.  (See AR 531, 1235)

At the time of Kao's diagnosis, she was covered by a LTD benefits plan funded by Towers and administered by Broadspire

---

[2] This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  Venue is proper in this Court under 28 U.S.C. § 1391(b).

[3] Citations to "AR" refer to the corresponding pages in the Towers Perrin Administrative Record.

Services, Inc. ("Broadspire").  (See AR 1246-47)  The governing

plan documents vested Broadspire with "full power, authority and

discretion to administer the Plans and to construe and apply all

of its provisions on behalf of [Towers,]" including deciding

issues of benefits eligibility.  (Towers[4] 011)

Kao's first absence from work attributable to her cancer and

related treatment was on January 11, 2005.  (See AR 1246-47)

Thereafter, she applied to Broadspire for LTD benefits.  (AR

1235)

The plan at issue defines "disability" as:

To maintain eligibility for LTD benefits, you must be
unable to perform each and every duty of your job for
the first 130 weeks you are disabled (26-week
elimination period plus two years of LTD).  The Plan's
definition of disability changes after 130 weeks.
After 130 weeks, to be considered disabled you must be
both of the following:
· Unable to perform any job for which you are
reasonably suited based on your education,
training and experience[5]
· Under the continuing care of a licensed medical
practitioner.

(Towers 53)  Thus, the policy contains two different definitions

of disability; one definition applies during the first two years

of LTD, and another thereafter.

Broadspire determined that Kao was eligible for LTD

---

[4] Citations to "Towers" refer to the pages Bates-stamped "Towers Perrin"
in Defendants' Exhibits B, C, and D.

[5] Throughout the claim evaluation process, Aetna appeared to concede
that for a position to satisfy the "any job" criterion, it must pay 60% of
Kao's pre-disability salary, which was $113,655 annually.  (See AR 576, 605)
Neither party has directed the Court to express language in the plan documents
articulating such a requirement.

benefits.  (AR 1246-47)  Following the required 26-week waiting period, Kao received LTD benefits for the two year period beginning July 12, 2005.[6]  (See AR 1246-47, 500-02)

In addition, Broadspire informed Kao that she might be eligible for Social Security disability benefits, and offered her access to professional representatives to assist her in pursuing those benefits.[7]  (AR 441)  Thereafter, the Social Security Administration determined that Kao was indeed disabled, and awarded her monthly disability benefits beginning in July, 2005.[8] (AR 504-07)

**B.**

By December, 2006, Aetna had replaced Broadspire as claims administrator for the Towers LTD plan.  (See AR 206)  Like Broadspire before it, Aetna was vested with broad discretion to construe and apply the provisions of the plan, and make eligibility determinations.  (See Towers 011)

In a letter dated December 8, 2006, Aetna informed Kao that it was "gathering the necessary information to determine if [she

---

[6] Broadspire initially determined that Kao was only eligible for LTD benefits for the limited time period of July 11, 2005, to August 1, 2005.  (AR 1246-47)  Kao successfully appealed that determination, and her LTD benefits were reinstated for the period of August 1, 2005, to July 12, 2007.  (See AR 500-02)

[7] Kao was, in fact, required to apply for Social Security benefits because she was receiving LTD benefits from Towers. (See Towers 054)

[8] It is unclear from the record whether Kao pursued the Social Security benefits independently, or if she employed the assistance of the professional representatives made available by Broadspire.

4

would] remain eligible for continued LTD benefits[]" after July 12, 2007, when the second definition of disability would take effect.  (AR 206-07)  Enclosed with the letter were various forms for Kao and her physicians to complete and return to Aetna.  (See AR 207)

In response to Aetna's letter, Kao and her doctors supplied: (1) a Resource Questionnaire completed by Kao; (2) an Attending Physician's Statement and an Evaluation of Physical Abilities form, both completed by Dr. Generosa Grana, one of Kao's oncologists; (3) a partial Attending Physician's Statement completed by Dr. Samuel Hughes, another of Kao's oncologists; and (4) various medical office records from Kao's physicians.

*Resource Questionnaire*

On January 5, 2007, Kao completed a "Resource Questionnaire" regarding her health and related issues.  (AR 517-23)  The form called for Kao to describe, in her own words, why she was unable to perform her occupation or otherwise engage in any gainful employment.  (AR 517)  She responded as follows:

> My mind is often hazy.  I have difficulties concentrating, thinking and recalling facts.  I have problems falling asleep and staying asleep due to aches, pains and stress.  I suffer from fatigue throughout the day.  I will have problems commuting to work because I always have to rest in the car even after short trips to the grocery stores.  Also, my shoulder hurts after short walks in the mall which I avoid unless absolutely necessary.  I get nauseous easily too.

5

(AR 517-18)  Citing the same health issues, Kao also stated that she did not "anticipate returning to [her] previous occupation or any other occupation in the near future[.]" (AR 520)

The questionnaire included a checklist of chores, which called for Kao to denote those tasks which she performed on a regular basis.  (AR 519)  Kao indicated that she regularly went grocery shopping, did laundry and dishes, and climbed stairs. (Id.)  On the other hand, she reported that she did not cook, dust, vacuum, garden, mow the lawn, shovel snow, or perform vehicle maintenance.  (Id.)

Kao also wrote that she took three or four 15-minute walks daily and drove an average of four miles per day.  (Id.) Finally, Kao listed a variety of medications which she took daily, including Arimidex, which is a hormonal therapy intended to reduce the likelihood of cancer recurrence.  (See id.)


*Dr. Generosa Grana*

Dr. Generosa Grana, one of Kao's oncologists, completed a pair of forms provided by Aetna — an Attending Physician's Statement ("APS") and an Evaluation of Physical Abilities ("EPA") form.  (See AR 531-33)  Both forms were signed on February 5, 2007.

On the APS, Dr. Grana noted Kao's primary diagnosis of breast cancer.  (AR 531)  According to Dr. Grana, the

complications of the illness were arthralgia and osteopenia.[9]
(Id.)  Dr. Grana indicated that Kao's prognosis was "good[,]" but
that she had not yet "achieved Maximum Medical Improvement[.]"
(AR 532)  According to Dr. Grana, "fundamental changes in [Kao's]
medical condition" could be expected in three to four months.
(Id.)

As to restrictions or limitations upon Kao's activities, Dr.
Grana wrote: "patient still suffering from the lingering side
effects of her disease process and treatment regimen, mostly
involving arthralgia[.]"  (Id.)  The APS also called for Dr.
Grana to rate Kao's level of physical impairment, on a scale of
one ("No limitation of functional capacity/capable of heavy
work") to five ("Severe limitation of functional
capacity/incapable of sedentary work").  (Id.)  Dr. Grana
appraised Kao's level of physical impairment as four,
corresponding to "[m]arked limitation of functional
capacity/capable of sedentary work."  (Id.)

On the EPA form, Dr. Grana indicated that Kao's overall
strength capacity was sedentary.[10]  (AR 533)  A rating of

---

[9] Arthralgia is defined as "pain in a joint." *Dorland's Illustrated
Medical Dictionary* 140 (28th ed. 1994).  Osteopenia "refer[s] to any decrease
in bone mass below the normal." *Id.* at 1202.

[10] Dr. Grana added a stray circle of uncertain import to the EPA form.
The EPA form included the following chart, intended to define the terms
Sedentary, Light, Medium, Heavy, and Very Heavy:

sedentary, in that context, meant occasional lifting, carrying, pushing, and pulling of one to ten pounds.  (Id.)

Dr. Grana further rated Kao as capable of reaching, walking, standing, sitting, handling, fingering, and repetitive foot movement "frequently," meaning one-third to two-thirds of the time.  (Id.)  But, Dr. Grana determined Kao was only "occasionally" (up to one-third of the time) capable of stooping, crouching, squatting, kneeling, crawling, and climbing stairs. (Id.)  Finally, Dr. Grana reported that Kao was not released back to her prior occupation because she "require[d] additional time to fully recover from treatment[.]"  (Id.)

*Dr. Samuel Hughes*

Dr. Hughes, another of Kao's oncologists, supplied a partial APS dated February 14, 2007, to Aetna.  (AR 534)  Like Dr. Grana, Dr. Hughes believed Kao's prognosis was good, but that she had not yet "achieved Maximum Medical Improvement[.]"  (Id.)  Dr. Hughes anticipated fundamental changes in Kao's condition in five

---

| Physical Demand Level | OCCASIONAL 0-33% of the workday | FREQUENT 34-66% of the workday | CONSTANT 67-100% of the workday |
|---|---|---|---|
| Sedentary | 1 -10 lbs. | Negligible | Negligible |
| Light | 11 - 20 lbs. | 1 -10 lbs. | Negligible |
| Medium | 21 - 50 lbs. | 11 - 25 lbs. | 1 - 10 lbs. |
| Heavy | 51 - 100 lbs. | 26 - 50 lbs. | 11 - 20 lbs. |
| Very Heavy | Over 100 lbs. | Over 50 lbs. | Over 20 lbs. |

Dr. Grana circled "1-10 lbs.[,]" which corresponded to "Sedentary" and "Occasional[.]"  This stray circle might be interpreted to mean that Dr. Grana believed Kao only to be capable of performing sedentary work no more than one-third of the time.

to six months.  (Id.)  Using the same rating system as Dr. Grana, Dr. Hughes rated Kao's level of physical impairment at level five, signifying "[s]evere limitation of functional capacity/incapable of sedentary work[.]"  (Id.)

*Dr. Marc Fishman*

At Aetna's request, hematologist/oncologist Dr. Marc Fishman completed a peer review of Kao's records on March 26, 2007.  (AR 109-11)  That process included a peer-to-peer review with Dr. Grana via telephone on March 19, 2007.  (AR 110)  In addition to the information gleaned from Dr. Grana directly, Dr. Fishman considered Kao's Resource Questionnaire, the APS and EPA prepared by Dr. Grana, the partial APS authored by Dr. Hughes, and medical records supplied by Kao's physicians.  (AR 109)  Dr. Fishman concluded that the data before him "[f]ail[ed] to support impairment for the entire time frame[.]"  (AR 110)

Dr. Fishman noted Kao's complaints of arthralgias, but determined that she was capable of working in a sedentary occupation.[11]  (Id.)  He noted that Kao's breast cancer had not recurred and that Dr. Grana's physical examination of Kao in October, 2006, was "essentially unremarkable[.]"  (Id.; see AR 470-71)  Finally, Dr. Fishman concluded that Kao's daily Arimidex

_____

[11] Dr. Fishman's report also represented that Dr. Grana stated to him, via telephone, that Kao's arthralgias would not limit her ability to work in a sedentary occupation.  (AR 110)

9

medication would not impact her ability to work.  (AR 110-11)

*Employability Assessment Report and Labor Market Survey*

Next, at Aetna's request, Randall Norris prepared an Employability Assessment Report ("EA") and a Labor Market Survey ("LMS") to determine what occupations Kao could perform, and whether those positions were available in her geographic area at a salary of at least 60% of Kao's pre-disability annual income. (See AR 576-91)  The EA and LMS were dated April 3, 2007, and April 17, 2007, respectively.  (AR 576, 585)

In preparing the EA, Norris relied on Dr. Marc Fishman's peer review of March, 2007, for the proposition that Kao was capable of sedentary work.[12]  (AR 577, 582)  After reviewing Kao's education and work history, Norris identified occupations suitable for her skill set, including: (1) Computer Programmer, Chief;[13] (2) Research Assistant; (3) Alumni Secretary; (4) Branch Manager; and (5) Institution Director.  (AR 580-83)

Norris then surveyed the availability of appropriate employment within a 50 mile radius of Kao's residence.  (AR 585) After a series of contacts with area employers, Norris concluded

---

[12] Norris also interviewed Kao by telephone on March 29, 2007.  (AR 577) Kao's responses during the interview were consistent with those she provided on the Resource Questionnaire.  She stated, among other things, "that suspect mental functioning and dizziness negatively impact[ed] her ability to return to work."  (Id.)

[13] As Norris recognized, this is the position that Kao held prior to her illness. (AR 580)

that suitable positions were available in Kao's geographic area, paying annual salaries exceeding 60% of her pre-disability salary.  (AR 588)

*Initial Denial Letter*

By letter dated April 19, 2007, Aetna informed Kao of its determination that she did not meet the definition of disability applicable to individuals claiming LTD benefits beyond 130 weeks. (AR 603-06)  Hence, as of July 12, 2007, Kao would no longer receive LTD benefits.  (AR 605)

In the letter, Aetna explained that there were "insufficient quantitative clinical findings documented to support a level of functional impairment that would render [Kao] unable to perform any occupation."  (Id.)  Aetna further stated that Kao had "no evidence of recurrent cancer of the breast and [she was] only taking the Arimidex for breast cancer[,]" medication which did "not impact [her] ability to work."  (AR 604)  In sum, according to Aetna, Kao was "capable of working in a sedentary occupation." (Id.)

In reaching those conclusions, Aetna particularly relied upon the medical opinion of Dr. Fishman, including Dr. Fishman's representation that "Dr. Grana does not feel that [Kao's arthralgias] would limit [her] from working in a sedentary occupation."  (AR 604)  Aetna also referred to the EPA form

11

completed by Dr. Grana for the proposition that Kao was capable of working in a sedentary occupation.  (Id.)

Aetna further explained that, based on its vocational assessment, jobs suitable for Kao included: (1) Systems Programmer; (2) Database Administrator; (3) Senior Oracle CRM; (4) Scientist; and (5) Programmer Analyst.[14]  (AR 605)  As to those positions, Aetna wrote, "[Kao's] current skills and aptitudes, as demonstrated through [her] former work experience, indicate that [she is] capable of engaging in competitive employment . . . as long as the actual duties of the positions are consistent with [her] functional capacity."  (Id.)  Moreover, according to Aetna, those positions existed within Kao's labor market.  (Id.)

The letter notified Kao of her right to appeal the adverse decision, and requested that, with respect to any appeal, she supply:

> current medical documentation, which includes **quantitative data**, such as, but not limited to the following:
>
> •   Additional clinical evidence that documents physical impairments from performing any occupation.

(AR 605-06 (emphasis in original))

Finally, the letter advised that "the review on appeal

_____

[14] As subsequently noted by a vocational expert retained by Kao, the list of suitable positions identified by Randall Norris in the Labor Market Survey dated April 17, 2007 differed from the positions listed in Aetna's initial denial letter.  (AR 551; compare AR 583 with AR 605)

[would] consist of a fresh review of [Kao's] claim based on the information already existing in [her] file, along with any additional documentation, records, documents, comments or other relevant material" submitted in support of her appeal.  (AR 605)

### C.

Through counsel, Kao appealed Aetna's adverse benefit determination.  (See AR 202-04)  In support of her appeal, Kao submitted three additional documents to Aetna as putative proof that she indeed met the pertinent definition of disability.  (AR 202)  Those documents included the following:  letters from Dr. Grana and Dr. Scott Miller, Kao's primary care physician; and a vocational rehabilitation assessment prepared by vocational expert Sonya Mocarski.  (AR 202, 539, 541-42, 544-59)


*Dr. Scott Miller*

By letter dated September 26, 2007, Dr. Miller explained that Kao had, "[f]rom an oncological standpoint . . . done very well[,]" insofar as she was currently cancer-free.  (AR 539) Nevertheless, according to Dr. Miller, Kao "suffers from several other impairments which . . . affect her ability to work."  (Id.) He explained that "[h]er most significant complaint is that of several [sic] and debilitating fatigue[,]" the genesis of which, Dr. Miller opined, was "probably multifactorial, including

13

medication (i.e. Aromasin[15]), sleep apnea, and depression."
(Id.)  Dr. Miller further wrote that Kao's "activities are
severely limited by her fatigue and she is unable to perform many
of her usual tasks because of this."  (Id.)  According to Dr.
Miller, Kao "needs to spend up to twelve hours a day in bed to
recuperate from her limited activities."  (Id.)

In addition to Kao's fatigue, Dr. Miller noted that she
"suffers from several other complaints including diffuse
arthralgias and low back pain[]" which "significantly limit [her]
activities."  (Id.)  Finally, Dr. Miller explained that Kao had
been his patient for more than thirteen years, and that he viewed
her complaints as credible, activity-limiting, and "significantly
impact[ing] her ability to work."  (Id.)


*Dr. Generosa Grana*

Dr. Grana's letter, dated October 8, 2007, explained that
she had been treating Kao since November, 2004, when Kao was
diagnosed with breast cancer.  (AR 541)  According to Dr. Grana,
Kao had been seen on multiple occasions since July, 2005, and
"continues to complain of arthralgias and significant fatigue as

---

[15] When Kao completed the Resource Questionnaire in January, 2007, she
did not list Aromasin among her medications.  (See AR 517-18)  Like Arimidex,
Aromasin is a post-breast cancer hormonal therapy that interferes with the
normal function of estrogen.  *See*
http://www.arimidex.com/arimidex-about/index.aspx;
http://www.aromasin.com/content/how_works.aspx
(both last visited Aug. 18, 2009) (for preserved versions of the cited
electronic resources, see attachment to this Opinion).

well as cognitive symptoms." (Id.) In addition, Dr. Grana explained that Kao "has difficulty with concentration, memory and other aspects of daily functioning[] . . . symptoms [which] have precluded her ability to perform her usual work as it is an intellectually demanding job that requires full concentration and energy." (Id.) Finally, Dr. Grana explained that Kao's "symptoms . . . are consistent" with her breast cancer diagnosis and treatment, noting that "[p]atients following breast cancer treatment can have long-term cognitive deficits that are often multifactorial in origin and related to both the chemotherapy, the hormonal therapy as well as the entire breast cancer experience." (Id.)

*Vocational Rehabilitation Assessment*

Sonya Mocarski[16] performed a vocational rehabilitation assessment on Kao, in order to determine what employment, if any, was suitable for her. (See AR 545-559) Mocarski gleaned the data for the assessment from an "[in-person] evaluation of Ms. Kao, review of her case records, and an analysis of the medical and vocational data." (AR 546)

Mocarski explained that Kao "is independent with most activities for daily living; however, she does require some

---

[16] According to her curriculum vitae, Mocarski's qualifications include: a master's degree in psychological services, certification as a vocational expert by the American Board of Vocational Experts, and extensive relevant professional experience. (See AR 561-68)

assistance from her husband with cooking and putting away groceries due to limitations with the left arm." (Id.) Mocarski also noted that Kao requires rest following physical activity due to fatigue, and limits her driving to local destinations. (Id.) In addition, Mocarski recognized that "[Kao] feels that her concentration and ability to focus have been compromised from her cancer treatment." (AR 547)

After summarizing Kao's work history, Mocarski explained that "Kao reported that her [most recent] jobs . . . required significant concentration due to their detailed nature." (AR 547-48) In addition, Kao believed, according to Mocarski, that "[h]aving been removed from the work force for three years . . . her technical skills and knowledge are now dated." (AR 548)

Under the heading "Medical Status[,]" Mocarski explained that Kao takes Aromasin daily, a treatment which Kao believes "has 'accelerated' her aging process, which makes her feel tired, fatigued and with joint pain."[17] (Id.)

With regard to Kao returning to work, Mocarski wrote:

> Ms. Kao complained of fatigue, joint pain and inability to concentrate and focus. She also experiences dizziness when she bends over . . . [a]s a result of these residual problems, she does not feel she would be able to work in any capacity on a full-time basis. If she were to work, she reported she would likely need a day in between each workday to rest. She has difficulty sustaining any activity for prolonged periods as a result of her

---

[17] Mocarski researched Aromasin, and concluded that medical and pharmaceutical literature concerning Aromasin "serves to validate Ms. Kao's complaints for dizziness, fatigue and joint pain." (AR 552)

fatigue.   She does not think she could perform any
continuous activity, such as typing, due to the stiffness
and swelling in the joints of her fingers and hands.

Ms. Kao has had difficulty doing anything that is
"mentally challenging" since her cancer and subsequent
treatment.   She continues to experience problems with
concentration and forgetfulness . . . .

(Id.)

Mocarski also performed a "Residual Functional Analysis[.]"

(See AR 552-53)  Relying on Kao's representations and the

assessments of Kao's physicians, Mocarski concluded that Kao

"lacks the functional capacity for sedentary employment and is

therefore not employable in 'any' work capacity."  (AR 553)

Finally, under the heading "Vocational Analysis[,]" Mocarski

explained that Kao was unable to work in any of the positions

identified by Randall Norris or listed in Aetna's initial denial

letter.[18]  (AR 554-56)


In the course of deciding Kao's appeal, Aetna provided the

contents of her file to four independent physicians for review.

Those physicians, and their specialties, were as follows: Dr.

Robert Marciniak (oncology), Dr. Dennis Mazal (internal

medicine), Dr. Vaughn Cohan (neurology), and Dr. Lawrence

Burstein (Psychology).  (See AR 113-38)  Each physician completed

---

[18]  It is apparent that Mocarski viewed Kao's physical limitations as a
barrier to performing any of these jobs.  In addition, Mocarski indicated that
Kao lacked the necessary qualifications for a number of the positions. (See AR
557-58)

a "Physician Review" form which included the following questions:

> 1a.  Based on the provided documentation . . . provide a detailed description of the claimant's functional impairments, if any, from 7/12/07 through, *Present*. Please specify the exam findings which corroborate the impairments noted.
>
> 1b.  If impairments are noted that impact work performance, provide any reasonable work restriction and/or accommodations that would be applicable and their anticipated lengths, e.g. 30 days, 90 days, permanent.
>
> 1c.  If impairment is not supported, what type of additional clinical documentation would be helpful for the evaluation of this claimant's proclaimed functional impairment?
>
> 2.  Based on the provided documentation . . . ; are there any functional examination findings suggesting that the claimant's ability to work has been impacted by an adverse medication effect during the time period in question?
>
> 3.  Based on the review of the provided documentation . . . please advise if the restrictions and/or limitations outlined by the treating provider(s) are appropriate?

(AR 116-18, 123-24, 130-31, 137-38)

*Dr. Robert Marciniak*

In response to question 1a, Dr. Marciniak explained that Kao was "functionally impaired by having undergone axillary lymph node dissection for breast cancer and by arthralgias secondary to use of Arimidex, from 7/12/07 through the present." (AR 116) While noting the absence of "examination findings to support the subjective complaints of arthralgias[,]" Dr. Marciniak recognized that "documentation of complaints of arthralgias are present

18

throughout the medical records."  (Id.)  Nevertheless, Dr.
Marciniak reached an "Impairment Conclusion" of "[f]ails to
support functional impairment for the entire time frame."  (Id.)

As to question 1b, Dr. Marciniak determined that Kao's
impairments would limit her to sedentary occupations.  (AR 117)
Also in response to question 1b, Dr. Marciniak indicated that Kao
would suffer from the following permanent work restrictions:
"[o]ccasional lifting of up to 10 pounds" and "prohibited from
stooping/crouching/kneeling/crawling secondary to her axillary
lymph node dissection."  (Id.)  Lastly, Dr. Marciniak explained
that Kao would be "limited in handling/fingering/repetitive foot
movements/carrying/pushing/pulling to occasionally[,]" until her
Arimidex treatment was completed, in July, 2010, at which point
she could perform those activities without restriction.  (Id.)

Dr. Marciniak responded to question 1c as follows:
"Impairment is supported and no further documentation is required
to assess the claimant's functional impairment."  (Id.)  As to
question 2, Dr. Marciniak noted Kao's repeated complaints of
arthralgias, but stated that "[t]here are no functional exam
findings that support that the claimant's ability to work has
been impacted by an adverse medication effect."  (Id.)  According
to Dr. Marciniak, arthralgias are the most common side effect of
treatment with a pharmaceutical such as Arimidex, and that
complaints of arthralgias "may or may not be associated with

physical exam findings."  (Id.)

As to question 3, Dr. Marciniak rejected Dr. Grana's opinion that Kao could not perform her usual work as unsupported by the medical records.  (Id.)  Instead, Dr. Marciniak opined that "restrictions limiting the claimant to a sedentary occupation secondary to her having undergone a left axillary lymph node dissection [were] supported[]" by the medical records.  (Id.) Finally, Dr. Marciniak found no medical documentation that Kao suffered from "recurrent problems with concentration/memory." (AR 118)

*Dr. Dennis Mazal*

As to question 1a, Dr. Mazal concluded that Kao's medical documentation "[f]ails to support functional impairment for the entire time frame[.]"  (AR 123)  Dr. Mazal acknowledged Kao's history of fatigue, but noted that she was "capable of taking care of all of her personal needs and performing the chores of grocery shopping, doing the laundry, doing the dishes and climbing stairs[] . . . [and] also able to go for walks, still maintained a valid driver's license and still drive and [sic] automobile."  (Id.)  Also, as to Dr. Miller's statement that sleep apnea was among the causes of Kao's fatigue, Dr. Mazal noted an absence of testing or documentation to indicate that Kao suffered from sleep apnea or any other sleep disorder.  (Id.)

As to Kao's complaints of arthralgias, Dr. Mazal found no documentation of synovitis[19] or a quantifiable decreased range of motion as would preclude Kao from working in any occupation. (Id.)

Next, Dr. Mazal stated that question 1b was "Not Applicable." (Id.)  As to question 1c, Dr. Mazal wrote:

> Additional clinical documentation that would be helpful could include the results of any polysomnography reports of MSLT testing as well as any comprehensive physical examination findings concerning the history of hypertension, back pain or arthralgias indicating a functional loss causing an inability to perform the duties of any occupation during the time period under consideration.

(AR 124)

As to question 2, Dr. Mazal found no documentation that Kao had taken any medication that would impact her ability to work in any occupation. (Id.)  But, Dr. Mazal limited the scope of that response by writing the following:  "[a]lthough the claimant has been on hormonal manipulation for breast cancer, that issue will be addressed by an oncology peer specialist." (Id.)

Finally, with respect to question 3, Dr. Mazal concluded that the information provided did not support any "restrictions or limitations at the workplace." (Id.)

---

[19]  Synovitis is defined as "inflammation of a synovial membrane[,]" *Dorland's Illustrated Medical Dictionary* 1645 (28th ed. 1994), meaning inflammation in a joint, *see id.* at 1007 (defining membrana synovialis inferior and membrana synovialis superior).

*Dr. Vaughn Cohan*

As to question 1a, Dr. Cohan concluded that Kao's medical file "[f]ails to support functional impairment for the entire time frame[.]" (AR 130)  While acknowledging that "[Kao's] treating physicians consider her to be unable to work on the basis of subjective complaints including fatigue, musculoskeletal pain, depression, sleep disorder and cognitive dysfunction[,]" Cohan opined "that the documentation provided does not demonstrate objective evidence of a functional impairment for work from 7/12/07 through the present time."  (Id.)

With respect to question 1b, Dr. Cohan stated that Kao would be restricted to sedentary work.  (Id.)  As to question 1c, Dr. Cohan wrote the following:

> Additional clinical documentation which would be useful . . . would include a comprehensive neurologic consultation describing the claimant's objective and quantified neurologic exam findings. A neuropsychological evaluation and a formal overnight sleep study would be useful. Musculoskeletal complaints could be evaluated as part of a neurological and/or orthopedics review including a description of the claimant's objective exam findings and radiographic and imaging studies as well. . . . A psychiatric or psychological evaluation would also be relevant.

(Id.)

In response to question 2, Dr. Cohan wrote that the provided medical documentation did not indicate that medication had caused Kao to be functionally impaired.  (Id.)  However, Dr. Cohan did not rule out the possibility that Kao's hormonal treatment could

22

adversely affect her ability to work, deferring to the judgment of the oncology peer reviewer regarding that issue.  (Id.)

Finally, with respect to question 3, Dr. Cohan concluded that "the medical documentation does not support the work restrictions outlined in the correspondence received from [Kao's] treating physicians."  (AR 131)

*Dr. Lawrence Burstein*

With respect to question 1a, Dr. Burstein concluded that the documentation "[f]ails to support functional impairment for the entire time frame[.]"  (AR 137)  Dr. Burstein recognized that Kao had "complained of cognitive impairments[,]" and that Kao's treatment providers "expressed the belief that [Kao] does suffer from impairments in her cognitive functioning[.]"  (Id.)  However, Dr. Burstein found no examination findings to support any diagnosis of cognitive impairment, and thus he found the notion of "impairments in her psychological functioning" to be unsupported.  (Id.)

Dr. Burstein determined that question 1b was not applicable. In response to question 1c, Dr. Burstein provided: "In order to support that the claimant has impairments in her cognitive functioning, her providers would have to submit the result of formal mental status examination and/or the results of performance-based tests of the claimant's cognitive functioning

along with standardized scores." (Id.)

As to question 2, Dr. Burstein reiterated the absence of documentation supporting psychological impairments. (Id.) Finally, Dr. Burstein determined that question 3 was inapplicable, insofar as Kao's treating physicians had not requested workplace accommodations of a psychological nature. (Id.)

*Final Denial Letter*

By letter to Kao's counsel dated April 1, 2008, Aetna stated that the original decision to terminate Kao's LTD benefits had been upheld. (AR 82-84) According to the letter, "the medical information provided failed to support [Kao's] inability to perform any job for which she is reasonably suited." (AR 82) Aetna also explained that "an Employability Assessment Report identified occupations consistent with her education, training and experience, and a Labor Market Survey identified jobs in her geographical area consistent with [the] salary requirements of the Plan." (Id.)

The letter listed each document considered by Aetna, and explained that "to afford [Kao] every opportunity available, her file was reviewed by independent peer physicians, specializing in Oncology, Neurology, Psychology, and Internal Medicine." (AR 82-83)

24

The letter concluded as follows:

Based upon our review of the submitted documentation, and the rationale detailed herein, the Aetna Appeal Committee has determined that there was insufficient medical evidence (i.e. results of any polysomnography, reports of MSLT testing, examination findings concerning the history of back pain or arthralgias indicating a functional loss causing an inability to perform the duties of any occupation, a neuropsychological evaluation and a formal overnight sleep study, the result of formal mental status examination and/or the results of performance-based tests, etc.) to support [Kao's] disability from any occupation, as of 7/12/07.  Therefore, the original decision to terminate LTD benefits, effective 7/12/07, has been upheld.

(AR 83)

Kao subsequently initiated this action, challenging Aetna's determination as to her eligibility for LTD benefits for the period beginning July 12, 2007.  The parties now cross-move for summary judgment.

**II.**

**A.**

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

In deciding a motion for summary judgment, the Court must

construe the facts and inferences in a light most favorable to the nonmoving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). "'With respect to an issue on which the nonmoving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Pub. Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*, 477 U.S. at 325). The role of the Court is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

When, as here, cross-motions for summary judgment are pending, "the Court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard." *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F.App'x 266, 270 (3d Cir. 2006). In ERISA cases such as this, this task is relatively straightforward, as the question presented by both motions is whether or not, based on the undisputed administrative record, Aetna's decision was an abuse of discretion. *See id.*

**B.**

26

The denial of benefits under an ERISA plan "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009).  Where, as here, the administrator is vested with discretionary authority to interpret and apply the terms of the plan, the Court applies an abuse of discretion standard.[19]  *Culley v. Liberty Life Assurance Co. of Boston*, No. 07-3952, 2009 WL 2143107, at *2 (3d Cir. Jul. 20, 2009).  Thus, the Court will "overturn a decision of the Plan administrator only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law."  *Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993) (internal quotation marks omitted).

The parties' moving briefs debate whether the Court should apply a "heightened" form of deferential review, under the "sliding scale" approach to conflicts of interest articulated in

---

[19] Kao does not argue that a *de novo* standard of review should apply to this case.

Prior Third Circuit caselaw "referenced an 'arbitrary and capricious' standard of review[,]" as applicable to cases where discretionary authority is vested in the plan administrator.  *Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 526 n.2 (3d Cir. 2009).  The Supreme Court recently described the proper standard as "abuse of discretion."  *Id.; Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2348 (2008). "[A]t least in the ERISA context, these standards of review are practically identical."  *Schwing*, 562 F.3d at 526 n.2 (citing *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 45 n.4 (3d Cir. 1993)).

*Pinto v. Reliance Standard Life Insurance Co.*, 214 F.3d 377 (3d Cir. 2000).  The "sliding scale" approach, however, is no longer good law in the wake of the Supreme Court's decision in *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343 (2008). *Schwing*, 562 F.3d at 525.  Instead, the Court will "consider any conflict of interest as one of several factors in considering whether [Aetna] abused its discretion."  *Id.* (citing *Glenn*, 128 S. Ct. at 2350).

### III.

Kao challenges the propriety of Aetna's decision, arguing that Aetna: (1) failed to adequately identify what documentation was necessary to perfect her claim; (2) improperly raised novel issues in its final denial letter; (3) failed to consider credible evidence supporting her disability, and misconstrued evidence; (4) should have afforded Kao the opportunity to respond to the reports generated by Dr. Mazal, Dr. Cohan, and Dr. Burstein before rendering a final decision regarding her appeal; and (5) failed to give due consideration to the Social Security Administration's determination that she was disabled.  The Court addresses each argument in turn.

### A.

Kao argues that Aetna's initial letter failed to adequately identify what documents were necessary to perfect her claim. Defendants respond that Kao's argument, predicated on § 503 of

28

ERISA, is not properly before the Court because no such claim was asserted in the operative Complaint.  In the alternative, Defendants argue that Aetna's correspondence complied with the requirements of § 503.

Kao's Amended Complaint does not expressly rely on 29 U.S.C. § 1133 (ERISA § 503).  However, Kao does assert that Aetna abused its discretion by denying her claim.  One consideration pertinent to whether Aetna acted within its discretion is its adherence, or lack thereof, to applicable procedures.  *See Schwing*, 562 F.3d at 526 (recognizing that the relevant factors are "varied and case-specific" and include "procedural concerns about the administrator's decision making process").  Thus, any failure to comply with § 1133 would be relevant to whether Aetna abused its discretion by denying Kao's claim.  *See Vaughan v. Vertex, Inc.*, No. 04-1742, 2004 WL 3019237, at *5-*8 (E.D. Pa. Dec. 29, 2004) (determining that administrator's failure to comply with § 1133 was a procedural anomaly requiring application of heightened arbitrary and capricious review).  Therefore, the Court will proceed to the merits of Kao's argument.

As Kao recognizes, the initial denial letter stated that she should support her appeal with "current medical documentation, which includes quantitative data, such as, but not limited to the following . . . [a]dditional clinical evidence that documents

physical impairments from performing any occupation[.]"[20] (Pl.'s Br. 16 (quoting AR 606))

As the parties agree, federal regulations require, among other things, that when a benefits claim is denied, the plan administrator will provide the claimant with "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary[.]"  29 C.F.R. § 2560.503-1(g)(1)(iii). An administrator need only "substantially comply" with the foregoing regulation.  *DellaValle v. Prudential Ins. Co. of Am.*, No. 05-0273, 2006 WL 83449, at *7 (E.D. Pa. Jan. 10, 2006) (citing *Wahl v. First Unum Life Ins. Co.*, No. 93-4813, 1994 WL 57214, at *3 (E.D. Pa. Feb. 17, 1994)).

According to Kao, the initial denial letter failed to provide her with sufficient guidance as to what information was necessary to perfect her claim.  In support of that argument, Kao primarily relies on *Booton v. Lockheed Medical Benefit Plan*, 110

---

[20] Kao notes that the body of the letter stated that "[n]o additional documentation is required at this time."  (Pl.'s Br. 16 (quoting AR 604)) Although not argued clearly, Kao is apparently suggesting that the foregoing language created an ambiguity as to whether she should supply additional medical documentation to support her appeal.

Looking at the letter as a whole, no rational reader could believe that the quoted sentence meant that Kao should not submit additional information to support her appeal.  To the contrary, it was apparent that if Kao submitted no additional information, her appeal would entail no more than a re-review by Aetna of documents that were deemed insufficient to establish disability upon initial review.

F.3d 1461 (9th Cir. 1997).[21]

*Booton* is readily distinguishable.  That case involved a plaintiff who was injured when she was kicked in the teeth by a horse.  110 F.3d at 1462.  Thereafter, she sought coverage for her dental treatment from her plan administrator, pursuant to a medical insurance policy "that excluded ordinary dental work, but did cover work required on account of accidental injury to natural teeth." *Booton*, 110 F.3d at 1462 (internal quotation marks omitted).  In response to the plaintiff's repeated requests for coverage, the administrator issued a series of *pro forma* denial letters providing little more than the following: "These services are not covered under your . . . Benefits Plan." *Id.* at 1462, 1462 n.4.  After the plaintiff retained an attorney, the administrator elucidated its reasoning only slightly, writing, "[i]t has been determined . . . that some of the dental work claimed . . . was not the result of an accidental injury." *Id.* at 1463 (ellipses in original).  The administrator prevailed in district court, but the Ninth Circuit reversed. *Id.* at 1463,

---

[21] Kao also provides string citations to *Gaither v. Aetna Life Insurance Co.*, 394 F.3d 792 (10th Cir. 2004), and *Abram v. Cargill, Inc.*, 395 F.3d 882 (8th Cir. 2005), as purported support for her argument that Aetna failed to comply with 29 C.F.R. § 2560.503-1(g)(1)(iii).  The Court is not persuaded that either case supports Kao's position.

In *Gaither*, the essence of the administrator's error was its failure to even recognize the nature of the claimant's putative disability. *See Gaither*, 394 F.3d at 806.  Here, there is no indication that Aetna was unaware of the basis for Kao's claim.  Aetna was simply not persuaded that Kao's condition met the pertinent definition of disability.

*Abram* is similarly unhelpful to Kao's argument, as the key issue in that case was whether a claimant was entitled to review and rebut medical documents generated during the course of her appeal, not whether the administrator's denial letter complied with the requirements of 29 C.F.R. § 2560.503-1(g).

1465.  Writing for a unanimous panel, Judge Kozinski explained
that the administrator abused its discretion by failing to obtain
readily available information which would have informed its
consideration of the claim, and thereby made "its decision
blindfolded."  *Id.* at 1463-64.

The Court can discern no meaningful parallels between *Booton*
and the instant case.  Here, the initial denial letter explained
that there were "insufficient quantitative clinical findings" to
support Kao's claim, and requested that Kao provide quantitative
data and clinical evidence to support her appeal.  There is
nothing cryptic about the meaning of Aetna's letter, or how Kao
should respond.  Aetna's conduct in this case thus stands in
stark contrast to the terse denials adjudged insufficient in
*Booton*.[22]  Aetna's letter was thus sufficient to discharge its
obligation under 29 C.F.R. § 2560.503-1(g)(1)(iii).  *See Mazur v.*

---

[22] Nor is the language of Aetna's initial denial letter similar to that
found insufficient in a pair of recent district court decisions in this
Circuit applying 29 C.F.R. § 2560.503-1(g)(1)(iii).  In *Sutley v.
International Paper Co.*, an administrator violated the regulation when its
initial denial letter failed to even inform the claimant that "he could submit
additional evidence in support of his claim for benefits[.]"  No. 07-105 Erie,
2009 WL 703555, at *12 (W.D. Pa. Mar. 16, 2009).

In *DellaValle v. Prudential Insurance Co. of America*, an administrator
did not provide sufficient information to a claimant when the body of an
initial denial letter provided only the following with respect to how the
claimant should support his appeal: "identify the issues and provide other
comments or additional evidence you wish . . . considered."  No. 05-273, 2006
WL 83449, at *7-*8 (E.D. Pa. Jan. 10, 2006).  The denial letter in *DellaValle*,
according to Judge Pratter, potentially left the claimant "at a loss as to
what more he might submit."  *Id.* at *8.

Here, by contrast to *Sutley* and *DellaValle*, Aetna's letter both apprised
Kao that she could provide additional information to support her appeal and
identified the type of information that she should submit — "current medical
documentation" that included "quantitative data" which could, but was not
required to, take the form of "clinical evidence that documents physical
impairments from performing any occupation."  (AR 606)

*Hartford Life and Accident Co.*, No. 06-1045, 2007 WL 4233400, at
*14 (W.D. Pa. Nov. 28, 2007) ("[The administrator] clearly
explained the basis for its termination decision, made [the
claimant] aware of his right to appeal, provided him with access
to his claim file, and told him that he was free to submit
additional information bearing on the claim.  This notification
was, at the very least, in substantial compliance with the
governing regulation.").

**B.**

(1)

Kao next contends that Aetna's final denial letter
improperly added a new rationale as the basis for denying her
claim.  According to Kao, the final denial letter stated, for the
first time, that Kao should have provided "specific evidence" to
support her claim, such as:

> The results of any polysomnography, report of MSLT
> testing, examination findings concerning the history of
> back pain or arthralgias indicating a functional loss
> causing an inability to perform the duties of any
> occupation, a neuropsychological evaluation and a formal
> overnight sleep study, the result of formal mental status
> examination and/or the results of performance-based
> tests, etc.

(Pl.'s Br. 19 (quoting AR 142))

Kao somewhat disingenuously divorces the quoted text from
its context.  The full quotation in the final denial letter is as
follows:

> Based upon our review of the submitted documentation, and

33

the rationale detailed herein, the Aetna Appeal Committee
has determined that there was insufficient medical
evidence (i.e. results of any polysomnography, reports of
MSLT testing, examination findings concerning the history
of back pain or arthralgias indicating a functional loss
causing an inability to perform the duties of any
occupation, a neuropsychological evaluation and a formal
overnight sleep study, the result of formal mental status
examination and/or the results of performance-based
tests, etc.) to support your client's disability from any
occupation, as of 7/12/07.

(AR 142)

Thus, in Aetna's view, Kao's appeal was deficient because it
lacked "medical evidence[,]" non-exclusive examples of which were
identified in parentheses.  That Aetna was searching for medical
evidence of Kao's purported disability should have been
unsurprising to Kao, in light of Aetna's request in its initial
denial letter that she support her appeal with "current medical
documentation, which includes **quantitative data**, such as, but not
limited to . . . [a]dditional clinical evidence that documents
physical impairments from performing any occupation."  (AR 606
(emphasis in original))  Therefore, Aetna's articulated reason
for denying Kao's appeal was consistent with its reason for
denying her initial claim, and likewise consistent with Aetna's
prior request that Kao substantiate her disability claim with
quantitative data.[23]

_____

[23] In other words, Aetna did not "tack[] on a new reason for denying
benefits in a final decision," as was the case in *Abatie v. Alta Health & Life
Insurance Co.*, cited by Kao.  *See* 458 F.3d 955, 974 (9th Cir. 2006) (finding
procedural irregularity when administrator initially denied a claim for
benefits on the basis that "no waiver of premium application had been
submitted" but later added a second explanation — insufficient evidence of
disability).

(2)

In the alternative, Kao contends that "there is no requirement in the policy materials or the summary plan description requiring any specific testing or need for clinical corroboration." (Pl.'s Br. 21 (emphasis omitted))  According to Kao, she "met her burden by providing statements" from Drs. Miller, Grana, and Hughes (id.), based on language in the plan description which provides that the plan administrator "may also request, from time to time, a statement from your doctor certifying that you continue to be disabled . . . and/or . . . may require you to have an independent medical examination by a physician of [the plan administrator's] choosing." (Id. (quoting Towers 056))

As a threshold matter, the issue decided adversely to Kao was not whether she sufficiently demonstrated that she **continued** to be disabled.  Rather, Aetna determined that Kao was not disabled in the first instance, under the definition of disability applicable after 130 weeks.

Moreover, as to Kao's argument that Aetna wrongfully required objective evidence, this Court rejected a similar argument in *Sarlo v. Broadspire Services, Inc.*, 439 F.Supp.2d 345 (D.N.J. 2006) (Irenas, J.).  In that case, the Court explained that "[b]ecause a reasonable person could find such objective evidence helpful in establishing a standard measurement of the

35

extent or severity of [a claimant's] symptoms and disability . . . , requiring such evidence was not arbitrary and capricious." *Sarlo*, 439 F.Supp.2d at 362 (citing *Nichols v. Verizon Commc'ns Inc.*, 78 F.App'x 209, 212 (3d Cir. 2003)). That statement from *Sarlo* applies with equal force to the instant case.

Nor is the Court persuaded by Kao's argument that the representations of her physicians "met her burden" and thus required Aetna to grant her claim for LTD benefits. The approach argued for by Kao would vest her physicians with, and divest Aetna of, the discretionary authority to determine her eligibility for LTD benefits. Such a result is contrary to the terms of the plan.

## C.

Kao next assails the denial of benefits on the basis that Aetna failed to consider credible evidence. The opinions allegedly ignored or misconstrued are those of Dr. Grana, Dr. Hughes, Dr. Marciniak, and Sonya Mocarski.

### (1)

As to Dr. Hughes, the document purportedly ignored is the partial Attending Physician's Statement dated February 14, 2007. Kao contends that the partial APS was not provided to the four independent physicians — Drs. Marciniak, Mazal, Cohan, and

Burstein — who considered her appeal.[24]

Kao's argument is unchallenged by Defendants, and supported by the administrative record.  Each of those four physicians completed a "Physician Review" form which lists, at length, the records reviewed.  Those lists do not include the partial APS authored by Dr. Hughes.

The question thus becomes what weight to accord this failure in the calculus of whether Aetna abused its discretion.  In *Glenn*, the Supreme Court described an administrator's failure "to provide its independent vocational and medical experts with all of the relevant evidence" as a "serious concern[][.]"  *Glenn*, 128 S. Ct. at 2352.  In *Hoch v. Hartford Life and Accident Insurance Co.*, No. 08-4805, 2009 WL 1162823 (E.D. Pa. Apr. 29, 2009), Judge Kelly considered this principle from *Glenn* in a case challenging an administrator's denial of LTD benefits.  In the case, Judge Kelly assumed that the plan administrator failed to provide its independent medical evaluators with medical records from one of the claimant's treating physicians.  *Id.* at *16.  However, the facts contained in those unprovided records "were all contained in several other medical records throughout [the claimant's] file."  *Id.*  Primarily for that reason, Judge Kelly did not "assign any substantial weight" to the notion that the

---

[24] Kao initially asserted that Dr. Hughes's partial APS was ignored altogether by Aetna.  However, as Defendants point out, Dr. Fishman's peer review report specifically lists the "Partial APS and office medical records from Dr. Hughes" among the information he reviewed.  (See AR 109)

administrator's denial of LTD benefits was based on "inadequate information and incomplete investigations." *Id.*

The instant case is analogous to *Hoch*. The partial APS completed by Dr. Hughes mirrors the APS completed by Dr. Grana, except in two respects. First, Dr. Grana anticipated fundamental improvement in Kao's condition in three to four months, whereas Dr. Hughes expected fundamental improvement in five to six months. (See AR 532, 534) Second, Dr. Grana rated Kao's level of physical impairment at "Class 4: Marked limitation of functional capacity/capable of sedentary work" while Dr. Hughes rated it at "Class 5: Severe limitation of functional capacity/incapable of sedentary work[.]" (See AR 532, 534) Later, by letter dated October 8, 2007, Dr. Grana adjusted her appraisal of Kao to more closely coincide with that articulated by Dr. Hughes in his partial APS. In that letter, Dr. Grana explained that Kao was unable to perform her usual work, which was of a sedentary nature. Thus, to the limited extent that Dr. Hughes's APS differed from Dr. Grana's APS and letter, it was in the sense that Dr. Hughes considered Kao marginally more functionally impaired than did Dr. Grana.

Yet, each of the four independent reviewers determined that Kao was not as restricted in her ability to work as was represented by Dr. Grana. It follows that those reviewers would not have agreed with Dr. Hughes's assessment of Kao's level of

38

functional impairment.

Further, an important issue for the independent reviewers was the absence of objective findings to support Kao's subjective complaints. Nothing in Dr. Hughes's partial APS would have cured that shortcoming. Therefore, as was the case in *Hoch*, the Court cannot assign substantial weight to the proposition that Aetna's four independent reviewers reached their conclusions by relying on incomplete information, when the missing information largely duplicated available information.

That said, Aetna's failure to provide complete information to its reviewers is not without bearing in the Court's analysis of whether Aetna abused its discretion. That error is a procedural irregularity which is entitled to some weight. *See* Glenn, 128 S. Ct. at 2352.

(2)

Kao also maintains that Aetna ignored Dr. Grana's opinion regarding her ability to perform sedentary work. In support of that argument, Kao points to the "Peer Review" completed by Dr. Fishman, in which he wrote: "I spoke with Dr. Grana today. Dr. Grana confirmed that the claimant has been complaining of arthralgias. **However she does not feel that this would limit the claimant from working in a sedentary occupation.**" (AR 110 (emphasis added)) Kao argues that the emphasized text was a misconstrual of Dr. Grana's actual opinion, which Aetna then

39

relied on.  According to Kao, when Dr. Grana refused, in the EPA, to release Kao back to her own occupation, it followed that Dr. Grana believed Kao incapable of any sedentary occupation.

In so arguing, Kao takes an interpretative leap from the text of the documents prepared by Dr. Grana prior to the peer-to-peer review with Dr. Fishman.  In the APS, Dr. Grana appraised Kao's progress as improved, her prognosis as good, and anticipated fundamental (positive) changes in Kao's condition within three to four months — i.e. by June or July of 2007.  On the same form, Dr. Grana appraised Kao's level of physical impairment as "Marked limitation of functional capacity/capable of sedentary work."  (AR 532)  Nor is there is any indication that Dr. Grana viewed Kao as indefinitely incapable of returning to her own occupation.  Dr. Grana merely declined to release Kao back to her own occupation as of February 5, 2007, with the caveat that Kao required additional recovery time.  In sum, it is not at all clear that Dr. Grana viewed Kao as permanently incapable of sedentary work at the time of the peer-to-peer conversation with Dr. Fishman.  Therefore, it was not unreasonable for Aetna to conclude, at the time of initial denial, that Dr. Grana believed Kao to be capable of sedentary work by July, 2007.

Moreover, insofar as Aetna may have misinterpreted Dr. Grana's opinion regarding Kao's physical capacity at the time of

40

initial denial, both Kao and Dr. Grana had ample opportunity to ameliorate any confusion on appeal. However, even in the letter in support of Kao's appeal, Dr. Grana wrote only that Kao's "symptoms have precluded her ability to perform her usual work as it is an intellectually demanding job that requires full concentration and energy." (AR 541) Dr. Grana did not, however, indicate that Kao was categorically incapable of all sedentary work.

(3)

Kao also maintains that Aetna ignored Dr. Marciniak's conclusions. Kao's contentions with respect to Dr. Marciniak center on certain limitations noted in his report, namely that Kao: (1) "would be limited to occasional lifting of up to 10 pounds"; (2) "prohibited from stooping/crouching/ kneeling/crawling secondary to her axillary lymph node dissection"; and (3) "limited in handling/fingering/repetitive foot movements/carrying/pushing/pulling to occasionally." (AR 117; Pl.'s Br. 22) Those interim findings notwithstanding, Dr. Marciniak concluded that Kao "would be limited to sedentary occupations by these impairments." (AR 117) In addition, Dr. Marciniak rejected Dr. Grana's opinion that Kao was incapable of performing her usual work. (Id.) Thus, Aetna did not ignore the **conclusions** drawn by Dr. Marciniak — conclusions that were, in fact, adverse to Kao's position.

41

(4)

Kao also maintains that Aetna improperly "ignored . . . without comment[]" the vocational analysis prepared by Sonya Mocarski.  (Pl.'s Opp. Br. 2)  While Aetna did not comment directly on that analysis, there is no requirement that an administrator specifically address each piece of evidence submitted by a claimant.  *See Midgett v. Washington Group Int'l Long Term Disability Plan*, 561 F.3d 887, 896 (8th Cir. 2009) ("29 C.F.R. § 2560.503-1(j) sets forth the requisite content of a notification of a benefit determination on review, and it does not require the plan administrator to discuss specific evidence submitted by the claimant.").

Moreover, Mocarski's conclusions are built on a platform of subjective data that Aetna rejected as untenable.  Specifically, Mocarski (who is not a physician) accepted Kao's subjective complaints, and the comments of Dr. Grana and Dr. Miller, as sufficient proof that Kao suffered from physical impairments that precluded her from engaging in sedentary employment.  It followed that Mocarski viewed the Employability Assessment Report and Labor Market Survey prepared by Randall Norris as flawed.  Any value Aetna might have attributed to Mocarski's conclusions was contingent upon accepting the data those conclusions were built upon — a condition precedent that did not occur.

**D.**

42

Kao next assails Aetna's handling of the Physician Review forms completed by the remaining three independent file reviewers, Drs. Mazal, Cohan, and Burstein.  Each of those physicians identified additional clinical documentation that would have been helpful to evaluate Kao's putative functional impairment.  According to Kao, Aetna should have informed her "of the need for additional evidence" to support her claim, rather than "rel[ying] on its perceived need for additional evidence as the rationale for denial on appeal."  (Pl.'s Br. 24) Essentially, Kao contends that she should have been provided with the documents generated by the independent reviewers during the pendency of her appeal, and afforded an opportunity to supplement her submission to respond to those reviewers.

The Third Circuit has not squarely addressed this issue, but has explained that "full and fair review" under ERISA includes a requirement that an administrator will "inform the participant of what evidence [it] relied upon and provide [the claimant] with an opportunity to examine that evidence and to submit written documents or rebuttal documentary evidence."  *Grossmuller v. Int'l Union, United Auto. Aerospace and Agricultural Implement Workers of Am., UAW, Local 813*, 715 F.2d 853, 858 (3d Cir. 1983)

More specific guidance is found in recent decisions by the Eighth and Tenth Circuits.  *See Midgett v. Washington Group Int'l Long Term Disability Plan*, 561 F.3d 887 (8th Cir. 2009); *Metzger*

43

*v. UNUM Life Ins. Co. of Am.*, 476 F.3d 1161 (10th Cir. 2007).  In *Metzger*, a claimant was denied long-term disability benefits by her plan administrator, both initially and on appeal.  476 F.3d at 1162-63.  In evaluating the appeal, the administrator obtained reports from two medical professionals, neither of whom were involved in the initial denial.  *Id.* at 1163.  Those reports analyzed the medical evidence provided by the claimant, but "contained no new factual information and recommended denial on the same grounds as the initial claim determination."  *Id.*  In subsequent judicial proceedings, the claimant maintained that, in the absence of an opportunity to respond to those appeal-level reports, she had been denied a "full and fair" administrative review as that term is defined by 29 C.F.R. § 2560.503-1(h)(2)(iii).  *Id.* at 1163, 1165.

In an opinion authored by Judge Lucero, a unanimous panel disagreed with the claimant's position.  After reviewing the text of 29 C.F.R. § 2560.503-1(h)(2)(iii),[25] 29 C.F.R. § 2560.503-

---

[25] That regulation provides that one requirement of "full and fair review of a claim and adverse benefit determination" is that the administrator:

> Provide . . . upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits.  Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section[.]

29 C.F.R. § 2560.503-1(h)(2)(iii).

1(m)(8),[26] and 29 C.F.R. § 2560.503-1(h)(3)(iii),[27] Judge Lucero recognized that the argument advanced by the claimant could "set up an unnecessary cycle of submission, review, re-submission, and re-review[,]" as follows:

> If plaintiff were allowed to rebut the opinions of professionals consulted at [the administrative appeal] stage, then the layman claims administrator would once again be faced with the possibility of receiving new medical opinions and judgments from plaintiff's experts. Subparagraph (h)(3)(iii) specifically requires such evidence be evaluated by qualified healthcare professionals. . . . Thus, if read according to plaintiff's view, the regulations set up an endless loop of opinions rendered under (h)(3)(iii), followed by rebuttal from plaintiff's experts, followed by more opinions under (h)(3)(iii), and so on.[28]

---

[26] Relevant documents, as defined in 29 C.F.R. § 2560.503-1(m)(8), include those "relied upon in making the benefit determination" or "submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination[.]"

[27] 29 C.F.R. § 2560.503-1(h)(3)(iii) provides that an administrator "deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment" must "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment[.]"

[28] Judge Lucero identified three additional reasons for rejecting the claimant's argument. First, a cycle of submissions and re-submissions "would undoubtedly prolong the appeal process, which, under the regulations, should normally be completed within 45 days." *Metzger v. UNUM Life Ins. Co. of Am.*, 476 F.3d 1161, 1166 (10th Cir. 2007). Second, "such repeating cycles of review within a single appeal would unnecessarily increase cost of appeals[,]" contrary to Congressional intent. *Id.* at 1166-67. Finally, the Department of Labor adopted 29 C.F.R. § 2560.503-1(m)(8) with the expectation that "specification of the scope of the required disclosure of 'relevant' documents will serve the interests of both claimants and plans by providing clarity as to plans' disclosure obligations, while providing claimants with adequate access to the information necessary to determine whether to pursue further appeal." *Id.* at 1167. According to Judge Lucero, permitting claimants "pre-decision access to relevant documents generated during the administrative appeal-would nullify the Department's explanation. Access to documents during the course of an administrative decision would not aid claimants in determining 'whether to pursue further appeal,' because claimants would not yet know if they faced an adverse decision." *Id.*

*Id.* at 1166.  The *Metzger* court thus concluded that documents
must be supplied to a claimant at two, and only two, discrete
points to accomplish "full and fair review": (1) "relevant
documents generated or relied upon during the initial claims
determination must be disclosed prior to or at the outset of an
administrative appeal[,]" *id.* at 1167 (citing 29 C.F.R.
§ 2560.503-1(h)(2)(iii)) and (2) "relevant documents generated
during the administrative appeal-along with the claimant's file
from the initial determination-must be disclosed after a final
decision on appeal[,]" *id.* (citing 29 C.F.R. § 2560.503-1(i)(5)).

The recent Eighth Circuit *Midgett* decision addressed the
same issue as *Metzger*, but against a somewhat more complex legal
framework.  In *Midgett*, a claimant relied on *Abram v. Cargill*,
395 F.3d 882 (8th Cir. 2005), for the proposition that she was
entitled to review and rebut physicians' peer reviews generated
during her administrative appeal, while that appeal was pending.
*Midgett*, 561 F.3d at 893.  Indeed, *Abram* had held that a plan
administrator had not provided a "full and fair review" when a
claimant was not permitted to review and respond to a report
generated during the pendency of an administrative appeal, when
that report later served as the basis for denying the appeal.
*Midgett*, 561 F.3d at 893-94 (citing *Abram*, 395 F.3d at 885).  The
unanimous panel in *Midgett* rejected the claimant's argument,
explaining that *Abram* was rendered non-binding by a subsequent

46

change in the applicable regulatory scheme.[29]  *Id.* at 894.

Relying extensively on *Metzger* and a series of changes to
the regulatory scheme that were not applicable in *Abram*,[30] the
*Midgett* court concluded that "the full and fair review to which a
claimant is entitled under 29 U.S.C. § 1133(2) does not include
reviewing and rebutting, prior to a determination on appeal, the
opinions of peer reviewers solicited on that same level of
appeal."  *Id.* at 896.

Here, Aetna's actions were consistent with what is required
under *Grossmuller*.  In the initial denial letter, Aetna apprised
Kao that her claim was denied for lack of objective evidence, and
advised her to submit quantitative, clinical data in support of

---

[29] In 2000, the Department of Labor amended the applicable procedural
requirements for benefits claims under employee benefit plans.  *Midgett*, 561
F.3d at 894.  "The amended requirements 'apply to claims filed under a group
health plan on or after the first day of the first plan year beginning on or
after July 1, 2002, but in no event later than January 1, 2003,' and 'to
claims filed under [other] plan[s] on or after January 1, 2002.'"  *Id.* (citing
66 Fed. Reg. 35,886, 35,888 (Jul. 9, 2001)) (alterations in original).
Although *Abram* was decided in 2005, the underlying claim for benefits giving
rise to that litigation was filed in 2000, hence the amended requirements did
not apply in *Abram*.  *Id.*

[30] The *Midgett* court identified two key respects in which the currently
applicable regulations differ from the regulations governing the *Abram*
decision.  First, when *Abram* was decided, the regulations "failed to specify
when a claimant was entitled to 'review pertinent documents.'"  *Midgett*, 561
F.3d at 894 (citing 29 C.F.R. § 2560.503-1(g)(1)(ii) (2000)).  By contrast,
under the current regulations, a claimant is entitled to review the relevant
materials following the initial denial of a benefits claim, *id.* (citing 29
C.F.R. § 2560.503-1(h)(2)(iii)), and again following the denial of an appeal,
*id.* at 895 (citing 29 C.F.R. § 2560.503-1(i)(5)).  Second, the current 29
C.F.R. § 2560.503.1(h)(3)(iii), which was not applicable to *Abram*, requires
that "in deciding an appeal of any adverse benefit determination that is based
in whole or in part on a medical judgment, . . . the appropriate named
fiduciary shall consult with a health care professional."  *Id.* (quoting 29
C.F.R. § 2560.503.1(h)(3)(iii)).  "Conspicuously absent from
§ 2560.503-1(h)(3)(iii)[,]" according to the *Midgett* court, "is any
requirement that the claimant be given the opportunity to review and rebut the
health care professional's conclusion."  *Id.*

her appeal.  The reports of Drs. Mazal, Cohan, and Burstein merely catalogued the types of clinical data that Kao could have provided.  Nothing about the factual basis for Aetna's determination was withheld from Kao, and she was afforded ample opportunity to marshal clinical data to support her disability claim.  Moreover, as explained at length in *Midgett* and *Metzger*, the text of the governing regulatory provisions — and the policies underlying those provisions — do not contemplate that a claimant will be afforded the opportunity to review and rebut physicians' reports developed during an administrative appeal.[31]

---

[31] It has been suggested that *Midgett* and *Metzger* are at odds with the Third Circuit's decision in *Grossmuller*.  *See Solomon v. Metropolitan Life Ins. Co.*, —–- F.Supp.2d ----, 2009 WL 1726335, at *13 (S.D.N.Y. Jun. 18, 2009); *see also Mead v. Reliastar Life Ins. Co.*, No. 2:05-332, 2008 WL 850678, at *8 (D. Vt. Jan. 29, 2008).  *But see Tyson v. Pitney Bowes Long-Term Disability Plan*, No. 07-3105, 2009 WL 2488161, at *4 (D.N.J. Aug. 11, 2009) (citing approvingly of *Midgett* and *Metzger* for the proposition that a claimant was not entitled to review and rebut appeal-level reports during the pendency of an appeal); *cf. Hoover v. Metropolitan Life Ins. Co.*, No. 05-4323, 2006 WL 343223, at *10 (E.D. Pa. Feb. 14, 2006) (rejecting, without mention of *Grossmuller*, the proposition that a claimant was entitled to review and respond to appeal-level physicians' reports analyzing "virtually the same medical evidence considered in the original claim denial.").

At least in the instant context, where the shortcoming identified by the independent reviewers during Kao's appeal was the same shortcoming noted in Aetna's initial denial letter, *Grossmuller* is not in tension with *Midgett* or *Metzger*, as the same result obtains under all three cases.

Moreover, it is not at all clear that *Metzger* or *Midgett* would permit an administrator to deny an appeal by relying on new evidence generated during an appeal-level review.  *Metzger* expressly limited its holding to circumstances when "appeal-level reports analyze evidence already known to the claimant and contain no new factual information or novel diagnoses[.]"  *Metzger*, 476 F.3d at 1167.  *Midgett* does not include any similar express limitation on the scope of its holding.  However, there is no indication in the facts of *Midgett* that the physicians' reviews in question contained new information or novel diagnoses.  *See Midgett*, 561 F.3d at 892.

The Court expresses no opinion as to whether a claimant is entitled to review and rebut, during the pendency of an administrative appeal, appeal-level documents that raise a novel ground for denial or otherwise implicate issues that the claimant had no opportunity to address in preparing the appeal.  That issue is not before the Court.

**E.**

Kao also maintains that Aetna failed to consider the Social Security Administration's ("SSA") determination that she was disabled.  The Third Circuit has deemed an administrator's disagreement with the SSA "relevant though not dispositive, particularly . . . when the administrator rejects the very diagnoses on which the Social Security benefits determination is based."  *Post v. Hartford*, 501 F.3d 154, 167 (3d Cir. 2007).[32] Kao correctly notes that the Supreme Court, in *Glenn,* regarded it as a "serious concern" that a plan administrator "had encouraged [the claimant] to argue to the Social Security Administration that she could do no work, received the bulk of the benefits of her success in doing so (being entitled to receive an offset from her retroactive Social Security award), and then ignored the agency's finding in concluding that she could do sedentary work[.]" 128 S. Ct. at 2352.

Insofar as Kao argues that Aetna ignored the award of Social Security disability benefits, that argument fails because Aetna expressly included the "correspondence from Social Security Administration (SSA), dated 2/10/06" in its recitation of the

_____

[32] Since *Post*, several district courts in this Circuit have granted summary judgment in favor of plan administrators, notwithstanding disagreements between those plan administrators and the SSA with respect to whether a claimant was disabled.  *See Vega v. Cigna Group Ins.*, No. 06-5841, 2008 WL 205221, at *7-*8 (D.N.J. Jan. 23, 2008); *Alford v. Hartford Life Ins. Co.*, No. 07-4527, 2008 WL 2329101, at *8-*9 (E.D. Pa. Jun. 3, 2008); *Hoch v. Hartford Life and Accident Ins. Co.*, No. 08-4805, 2009 WL 1162823, at *16-*18 (E.D. Pa. Apr. 29, 2009).

documents evaluated in resolving Kao's administrative appeal. (AR 83)

Nor is the outcome of *Glenn* controlling; the instant case is distinguishable from *Glenn* in at least two key respects. First, in *Glenn*, one entity was responsible both for determining whether employees were eligible for LTD benefits and for paying those benefits to successful claimants. 128 S. Ct. at 2346. The Court explained, at length, why such a dual role constitutes a conflict of interest, and also clarified how such a conflict weighs in the calculus of whether a plan administrator acted within its discretion in making a benefits eligibility determination. *See id.* at 2348-52; *id.* at 2356 (Kennedy, J., concurring and dissenting) (recognizing majority opinion's lengthy consideration of the conflict of interest issue). Here, no entity held a dual role — Aetna determined whether Kao was entitled to receive LTD benefits from Towers, the plan funder.

Second, the claimant in *Glenn* suffered from a heart condition that improved little, if at all, during the period between when she was deemed disabled by the SSA and when the plan administrator issued a final denial of disability. *See Glenn v. Metlife*, 461 F.3d 660, 662-65 (6th Cir. 2006). In the case at bar, the SSA issued a Notice of Award dated February 10, 2006, which indicated Kao became disabled under its rules on January 11, 2005. (AR 504) As of January, 2005, Kao had only recently

been diagnosed with breast cancer, and was about to embark upon a course of chemotherapy, followed by a lumpectomy and an axillary node dissection, and finally radiation therapy — with those treatments and surgical procedures extending from January, 2005, through September, 2005.  (See AR 106, 359, 414-18)  In December, 2005, a mammogram performed on Kao was negative for recurrent malignancy, and her cancer remained in remission thereafter.  (AR 496, 539)

Thus, unlike the claimant in *Glenn*, Kao experienced a significant improvement in her physical condition after the date she became disabled under SSA rules.  As such, it is unremarkable that Aetna deemed Kao not disabled as of July 12, 2007, notwithstanding the SSA's determination that she was disabled as of January 11, 2005.[33]  Therefore, the Court is not persuaded that the "disagreement" between the SSA and Aetna with respect to whether Kao was disabled was a disagreement at all, given the intervening improvement in her health.

In sum, the majority of Kao's challenges to the denial of her benefits claim are without merit.  The Court's only concern with respect to Aetna's process is its failure to provide Dr.

---

[33] Nor is Kao necessarily entitled to receive disability benefits from the SSA in perpetuity.  Rather, the SSA is entitled to review Kao's disability status at any time.  Indeed, the Notice of Social Security Award received by Kao expressly stated that her matter would be reviewed in 5 to 7 years, and that her benefits would continue only if she was still disabled.  (AR 507)  Aetna, of course, was not required to await action by the SSA before initiating its own review of whether Kao remained eligible to receive LTD benefits.

Hughes's partial APS to the four independent peer reviewers.  *See supra* pt. III, C.  That irregularity does not render Aetna's claim determination an abuse of discretion.

**IV.**

Kao dedicates the vast majority of her briefing to attacking virtually every aspect of Aetna's handling of her claim — without success, for the most part.  Moreover, the administrative record lacks objective proof that Kao is unable to perform any job for which she is reasonably suited.  Instead of providing quantitative data or clinical evidence of a disabling condition, Kao offered Aetna a scattershot series of subjective complaints including arthralgias, fatigue, and cognitive difficulties, purportedly attributable to her history of cancer and related treatment, sleep apnea, and depression, or some combination thereof.  Kao pointed Aetna to no objective corroboration for these subjective claims, nor did she assert that she suffers from a condition for which clinical testing, treatment, medication, or therapy is unavailable.  Therefore, Aetna could reasonably have concluded that the evidence supplied by Kao was insufficient.

If there were any remaining doubt whether Kao had sufficiently demonstrated a disability, four independent reviewers concurred that Kao was capable of sedentary work.  In addition, to the extent there may have been any question whether medical testing was available that would corroborate Kao's

subjective complaints, the reviewers identified several procedures and examinations, the results of which might have tended to support Kao's claim — if they had been performed.[34]

Against this backdrop, Aetna was within its discretion to conclude that Kao failed to satisfy the applicable definition of disability, and terminate her LTD benefits.

**V.**

For the reasons stated above, Kao's Motion for Summary Judgment will be denied, and Defendants' Motion for Summary Judgment will be granted.  The Court will issue an appropriate Order.


Dated:  August  __25__th, 2009

                                    ___s/ Joseph E. Irenas___
                                    **JOSEPH E. IRENAS, S.U.S.D.J.**

---

[34] Kao challenges Defendants' reliance on *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003), cited by Defendants for the proposition that Aetna was entitled to credit its own file reviewers over Kao's treating physicians.  It is beyond question that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  *Black & Decker*, 538 U.S. at 834.
    According to Kao, Defendants can derive no benefit from *Black & Decker* because the final letter denying Kao's appeal did not expressly credit Aetna's file reviewers over Kao's treating physicians.  The Court is not persuaded by Kao's position.  The opinions of the file reviewers were relevant to, and incorporated in, Aetna's determination that Kao failed to supply sufficient evidence of disability.  Aetna had no "discrete burden" to explain further.